IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 24, 2025

**STATE OF TENNESSEE v. JOSHUA MCKINLEY HAMMONDS**

**Appeal from the Criminal Court for Washington County**
**No. 47276    Stacy L. Street, Judge**

_____

**No. E2024-01839-CCA-R3-CD**

_____

A Washington County jury convicted the defendant, Joshua M. Hammonds, of first-degree murder in perpetration of a felony, theft of property valued at $10,000 or more but less than $60,000, and evading arrest with risk of death.  After a sentencing hearing, the defendant received a sentence of life in confinement.  On appeal, the defendant contends the evidence presented at trial was insufficient to support his conviction for first-degree murder in perpetration of a felony.  Upon our review of the record, the parties' briefs, and the applicable law, we affirm the defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and MATTHEW J. WILSON, JJ., joined.

Gene G. Scott, Johnson City, Tennessee, for the appellant, Joshua McKinley Hammonds.

Jonathan Skrmetti, Attorney General and Reporter; Park Huff, Assistant Attorney General; Steve Finney, District Attorney General; and L. Scott Shults, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On December 7, 2020, between 3:30 p.m. and 4:00 p.m., Tony Wilder, an employee of King's Dairy Farm in Sullivan County, noticed that his Chevrolet GM Silverado pickup truck, which he described "between silver and gold" in color, had been stolen while he was at work.  In response, Mr. Wilder filed a police report.  At approximately 6:00 p.m., after

he had finished working, Mr. Wilder drove around the area attempting to track down his missing vehicle. He was accompanied by Cayden Keys, a fellow employee.

At 7:15 p.m., Joseph Gaus, an employee of Barnhart Crane & Rigging, arrived at work to park a Peterbilt tractor for the night. At the time, Mr. Gaus was assigned to drive the yellow Peterbilt tractor 32-0-9 with a red fender. When he arrived, the gate was locked, but he had received instructions to leave the gate unlocked for employees who were arriving later that evening. Mr. Gaus parked the Peterbilt tractor and, as was customary for drivers, left the keys in the ignition and a few personal items in the vehicle. Mr. Gaus then proceeded into the office for approximately ten minutes to complete time sheets. When he emerged, he noticed a silver Chevrolet pickup truck that he did not recognize. The defendant, standing next to the truck, was attempting to transfer diesel fuel from one of Barnhart's tanks into the Chevrolet truck. Not knowing who the defendant was, but believing he was a "regular employee," Mr. Gaus did not confront the defendant and, instead, made small talk. Mr. Gaus then got into his car and left the premises. In his testimony, Mr. Gaus described the defendant's demeanor during this interaction as "not jittery or anxious." He believed the defendant to be acting "perfectly normal." After Mr. Gaus left the Barnhart premises in his own vehicle, security camera footage showed the Peterbilt tractor also exit Barnhart's parking lot.

Elmer Fletcher, branch manager for Barnhart Crane & Rigging, estimated the fair market value of the Peterbilt 32-0-9 to be between $15,000 and $30,000. Mr. Fletcher testified that no one, other than Barnhart employees, had permission to drive the Peterbilt tractor.

At 8:14 p.m., Captain John Light with the Washington County Sheriff's Office (WCSO) dispatched Deputy Sylvoski Bogus to the Appalachian Fairgrounds upon receiving a report concerning a disturbance involving a yellow Peterbilt tractor with a "Barnhart" logo attempting to ram a gate. By the time Deputy Bogus arrived, the Peterbilt tractor was no longer present at the Fairgrounds. In response, Captain Light issued a "be on the lookout" (BOLO) call for the Peterbilt tractor.

Between 8:30 p.m. and 9:00 p.m., Mr. Wilder and Mr. Keys, in their search for the Chevrolet Silverado, drove to the Trailblazer Market. Mr. Keys described the Trailblazer Market as a "hotspot for stolen goods." While at the Trailblazer Market, Mr. Wilder and Mr. Keys were approached by the defendant offering to sell them a Peterbilt tractor for $15,000. Mr. Wilder motioned to Mr. Keys to photograph the vehicle because he "knew something wasn't right." Mr. Wilder described the defendant's behavior as "too fidgety, too jumpy." He was "acting like he was in a big hurry." Mr. Keys testified that the defendant appeared to be under the influence, because he was not making sense.

Mr. Wilder was also suspicious of the offer because the truck was marked with "Barnhart Crane Service," and the defendant did not know how to properly operate the vehicle. Mr. Wilder testified that the defendant was "stripping gears" and nearly hit several fuel pumps and another vehicle as he exited the parking lot. Mr. Keys reported the incident to 911. After the defendant left the Trailblazer Market, Mr. Wilder and Mr. Keys followed him for approximately ten to fifteen minutes until the police arrived. During that time, Mr. Wilder described the defendant's driving as "dangerous" and "reckless." Within half an hour of his interaction with the defendant, Mr. Wilder received a call from Washington County detectives that they had recovered his Chevrolet GM Silverado from Barnhart Crane & Rigging.

At approximately 9:00 p.m., Captain Light received a report of a disturbance at the Trailblazer Market. As Deputy Bogus was responding to the disturbance call at the Trailblazer Market, he passed the defendant driving the stolen Peterbilt. Upon seeing the defendant, Deputy Bogus activated his emergency blue lights and sirens in an attempt to conduct a traffic stop. The defendant refused to stop and led Deputy Bogus on a high-speed chase. According to Deputy Bogus, the defendant was traveling 75 miles per hour in 40 mile-per-hour zones.

At 9:06 p.m., Captain Light instructed Deputy Bogus to discontinue the chase due to concerns of danger to the public. Deputy Bogus testified that while he might have continued the chase, he too had concerns about the number of drivers on the road given the defendant's erratic and high-speed driving. While on cross-examination Deputy Bogus agreed that the defendant's driving behavior could have been indicative of impairment, he testified on direct examination that the defendant's behavior was also consistent with someone evading the police.

Trooper Gavin Ruff with the Tennessee Highway Patrol (THP) was one of the officers who received the BOLO call concerning the stolen Peterbilt. As he drove down Ft. Henry Drive in Sullivan County toward Washington County, he located a vehicle matching the description of the Peterbilt pulled in an alleyway of Moody Sprinkler Company. He described the tractor as "sitting still" facing down an alley with its engine running and brake lights illuminated, giving him the impression that the driver's foot was on the brake. Trooper Ruff requested backup before approaching the vehicle because the "BOLO had said [the driver] was driving extremely recklessly, incorrectly lanes of travel, high speed in a very high-populated area." Trooper Ruff assumed that if he attempted to stop the Peterbilt alone, it would initiate a second, reckless chase.

Trooper Ruff pulled his patrol car to the side of Moody Sprinkler Company to radio for backup. As he was doing so, the Peterbilt backed up, did a "several point turn" and reversed down the alleyway. Trooper Ruff observed that the tractor was yellow, labeled

"Barnhart" on the side, and that the driver was a white male. Trooper Ruff immediately activated his blue lights and attempted to make contact with the vehicle in the alleyway. Immediately, the defendant accelerated towards Trooper Ruff, veering to the left and narrowly missing his patrol car. The defendant drove away on Ft. Henry Drive. Once Trooper Ruff was able to turn around and exit the alleyway, he saw additional officers with their "blue lights activate[d]" pursing the defendant.

Just after the defendant accelerated past Trooper Ruff, he was seen by Trooper Richard Page also with the THP. Trooper Page observed the defendant driving without his headlights on and "approached him." In response, the defendant intentionally swerved the Peterbilt into Trooper Page's lane of traffic and forced him off the road. Trooper Page made a U-turn, activated his blue lights, and began pursuing the defendant southbound on Highway 36.

As the defendant led Trooper Page on a high-speed chase, the defendant alternated between moving into oncoming, northbound traffic and hitting his brakes, forcing Trooper Page to slow his pursuit. As the defendant and Trooper Page approached the intersection with Highway 75, the defendant sped through a red light, forcing two vehicles to swerve out of his path. When Trooper Page was able to make his way safely through the intersection and draw closer to the Peterbilt, the defendant, again, crossed the median into oncoming traffic. The defendant drove directly towards three oncoming vehicles. Two vehicles were able to avoid the Peterbilt, but the defendant drove head on into the third vehicle, killing the driver, Timmy Hensley. Trooper Page testified that at no point during the high-speed chase did he see the defendant operate his headlights or his brake lights.

After the collision, Trooper Page conducted a preliminary investigation. In searching the Peterbilt, he discovered a backpack belonging to Mr. Gaus. Inside the backpack, Trooper Page found Mr. Gaus' identification card, as well as a cut straw with white residue.

The defendant made a statement at the scene that he "thought it wasn't real." Trooper Page testified, "I guess you could say signs of impairment were there. But he was just, you know, screaming 'cause he was in pain." The defendant was taken by ambulance to the Johnson City Medical Center. Trooper T. K. Sallin with THP obtained a search warrant for the defendant's blood.

Philip Warren of the THP's Critical Incident Response Team (CIRT) testified that his primary duty was to assist other THP troopers with "crash investigations." For this case, he analyzed measurements collected at the scene and photographed the Peterbilt tractor and the vehicle of the victim. Using the evidence collected, Mr. Warren recreated an overhead view of the collision to depict the nature of the roadway, the alignment, the

pavement markings, the vehicles involved, and their positioning at final rest. He testified that after impact the Peterbilt rotated, landing on the driver's side door and came to final rest between the northbound lane and the roadway's shoulder. The victim's vehicle came to rest perpendicular to the roadway. In addition, Mr. Warren noted that the victim's seatbelt had been stretched during the collision, indicating that he had been wearing it when his vehicle had been struck.

Medical Examiner Dr. Emilie Cook conducted the autopsy on the victim. The autopsy revealed that the victim sustained multiple abrasions, lacerations, contusions, and large areas of blood pooling around his left eye. There was blood on his brain and in his abdominal cavities. He had bilateral rib and hip fractures, as well as a liver laceration and injury to his spleen. Dr. Cook concluded that the cause of death was multiple blunt force injuries caused by being struck by another vehicle head-on. On cross-examination, Dr. Cross agreed that she listed in her report the manner of death was "accident," but clarified on re-direct examination that "accident" as a manner of death is not a legal definition. She testified that the classification of "accident" was used because the death was due to a motor vehicle.

Michael Tilton, a special agent with the Tennessee Bureau of Investigation (TBI) testified as an expert in forensic science. He received a blood sample from the defendant and determined that it contained no ethyl alcohol. The blood sample tested positive for one nanogram per milliliter of hydromorphone, amphetamine at less than 0.05 micrograms per milliliter, and methamphetamine at 0.31 micrograms per milliliter. Agent Tilton testified that hydromorphone is known as Dilaudid, an opiate given by emergency services or hospitals after severe injuries or before emergency surgeries. He described methamphetamine and amphetamine as prescription medications commonly taken for ADD, weight loss, or narcolepsy. Agent Tilton testified that while the amounts of methamphetamines and amphetamines were above normal therapeutic levels, he was unable to testify to whether those amounts would impair the defendant without knowledge of the defendant's personal usage history. On cross-examination, Agent Tilton agreed that methamphetamine at the levels found in the defendant's blood could have impaired a person's faculties either as a stimulant or as a depressant.

Mike Little, a criminal investigator with the First Judicial District, analyzed the evidence of the defendant's movements on December 7, 2020, and mapped them in sequential order. The markers were placed at (1) 705 Warren Drive, (2) Barnhart Crane & Rigging, (3) Appalachian Fairgrounds, (4) Trailblazer Market in Washington County, (5) Moody Sprinkler Company in Sullivan County, and (6) the collision site in Washington County. Mr. Little also testified as to the contents of inmate communications between the defendant and his girlfriend through an inmate communication platform called "Chirps." Through Chirps, an inmate is given an assigned individualized tablet through which he can

communicate with friends and family. The district attorney general's office has access to the "chirps" for investigative purposes. Mr. Little testified that on June 23, 2023, the defendant communicated the following to his girlfriend,

> DEFENDANT: So we looking at my papers, and they got me charged for stealing the truck in Washington County, and I didn't take it in Washington, the truck was took in Sullivan 'C.'" . . . So how can they charge me here for the theft when it happened in Sullivan?

> GIRLFRIEND: Cause you crossed over in Washington with it."

> DEFENDANT: But I had done crossed over in Washington once, and they had me in Sulphur Springs trying to sell it. Then I went back into Sullivan County, then back into Washington."

> GIRLFRIEND: They will have to drop that charge and shouldn't be able to charge you. But they are just trying to charge you with everything they can."

Mr. Little testified that the communication between the defendant and his girlfriend seemed to follow the same sequence of the Peterbilt's movements at specific points on the night of the collision. Mr. Little coupled the defendant's outline of his own movements with those recreated on the map through his collection of evidence. On cross-examination, Mr. Little agreed the defendant's statement to his girlfriend was not an admission to the theft of the Peterbilt.

The State rested, and the defendant elected not to offer proof. Based on the above evidence, the jury convicted the defendant of first-degree murder in the perpetration of a felony, theft of property valued at $10,000 or more but less than $60,000, and evading arrest with risk of death. After a sentencing hearing was held, the trial court sentenced the defendant to an effective life sentence. This timely appeal followed.

### *Analysis*

On appeal, the defendant argues that the evidence is insufficient to sustain his conviction for first-degree murder in perpetration of a felony. Specifically, the defendant contends the evidence is not sufficient because the killing was not closely connected to the theft of the Peterbilt tractor. The State asserts that there was sufficient evidence presented at trial that a reasonable juror could find a sufficiently close connection between the killing of Timmy Hensley and the theft. We agree.

- 6 -

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *See id.* at 379. Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999). This Court, when considering the

sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.* This Court will not exchange its "inferences for those drawn by the trier of fact from circumstantial evidence." *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A first-degree murder is the "killing of another committed in the perpetration of or attempt to perpetrate . . . [a] theft[.]" Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction" of first-degree felony murder, "except the intent to commit the enumerated" offense. Tenn. Code Ann. § 39-13-202(b). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). "The felony murder rule applies when the killing is 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (Tenn. 1956)). Nonetheless, "[t]he killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." *Id.* (internal quotation marks omitted) (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)). The jury "may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id.* (internal quotation marks omitted) (quoting *Buggs*, 995 S.W.2d at 106).

Our supreme court has held, "in determining whether the evidence is sufficient to support a conviction of first-degree murder in the perpetration of a theft, a court must determine whether the killing is closely connected to the initial taking of the property in time, place, causation, and continuity of action." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). If, however, there "is a break in the chain of events between the felony and the killing, the felony murder rule does not apply." *Id.* at 295. An important factor "to consider in determining whether there has been a break in the chain of events that would preclude application of the felony murder rule is whether the felon has reached a place of temporary safety." *Id.*

The defendant's central argument on appeal is that the killing of Mr. Hensley and the theft of the Peterbilt tractor were not sufficiently connected to be considered in "perpetration" of the latter. However, when viewed in the light most favorable to the State, there was sufficient evidence from which a rational trier of fact could find that the killing of Mr. Hensley was in perpetration of the theft of the Peterbilt truck and that there was sufficiently close connection between the two in time, location, causation, and continuity of action.

- 8 -

The State introduced video footage that showed the defendant drive the Peterbilt tractor off the Barnhart Crane & Rigging property between 7:30 p.m. and 8:00 p.m. After that point in time, numerous witnesses testified to the reports of the defendant's disturbances and reckless driving at the Appalachian Fairgrounds and the Trailblazer Market. Deputy Bogus described the defendant's refusal to comply with the initial traffic stop and the great risk to human life he took to evade arrest. Trooper Ruff testified that it was less than a half hour after Captain Light issued the BOLO that he discovered the defendant hiding in the alleyway with his engine running and brake lights illuminated. Upon being discovered, Troopers Ruff and Page testified that the defendant led them on a second high-speed chase that placed both their lives and other motorists' lives in danger until ultimately, the defendant drove head on into Mr. Hensley at approximately 9:36 p.m. The State also introduced a map of the six locations between which the defendant traversed in the stolen Peterbilt during the two-hour window he spent creating disturbances and dangerously fleeing the police.

From our review of the record, we conclude that a reasonable juror could find the time, location, causation, and continuity of action all satisfactorily connected to determine that the defendant's killing of Timmy Hensley was done in perpetration of the theft of the Peterbilt tractor. Accordingly, the evidence is sufficient to support the defendant's conviction.

Moreover, the defendant's application of our supreme court's holding in *State v. Pierce*, 23 S.W.3d 289 (Tenn. 2000), is flawed as the facts in *Pierce* are remarkably divergent from the case at bar. In *Pierce*, the defendant's friend stole a vehicle belonging to her mother while the defendant and another person were present in the car. *Id.* at 291. The three people fled the state where they remained for nearly three weeks. *Id.* at 291-92. Twenty days and several states away from the theft, the trio were discovered by the police and the defendant led the police on a high-speed chase. *Id.* While attempting to evade a roadblock, the defendant hit a parked police car and killed a police officer. *Id.* In contrast, here, the defendant's theft and the killing of Mr. Hensley occurred two hours and only a few miles apart.

In addition, the supreme court in *Pierce*, found that the chain of events between the underlying theft and the killing had been broken because the defendant and his cohorts had reached a "place of temporary safety." *Id.* at 297. The supreme court rationalized that the killing could not have been in perpetration of the theft because the defendant was "not being actively and continuously pursued by police during this time, nor was he attempting to hide from the police." *Id.* This reasoning is inapplicable here where the defendant failed to reach a place of temporary safety. In the case at bar, the evidence presented shows that the police were continuously pursuing the defendant from early in the evening until the moment of the collision. Furthermore, the defendant clearly attempted to hide from the

police in the alleyway until he was discovered. Therefore, the defendant did not reach a place of temporary safety, and the chain of events between the theft of the Peterbilt tractor and the killing of Timmy Hensley was not broken.  This argument is without merit.

### *Conclusion*

Based on the authorities and reasoning, we affirm the judgment of the trial court.

s/ J. ROSS DYER            _
J. ROSS DYER, JUDGE